We'll hear the first case, United States v. Pauling. Good morning, your honors, and may it please the court. My name is Jason Swergold, and I'm an assistant United States attorney in the Southern District of New York. I represent the United States on appeal, and I represented the United States at trial. After a jury found John Pauling guilty of conspiring to distribute 100 grams and more of heroin, the district court erroneously vacated the verdict as to drug weight under Rule 29. The evidence at trial proved that Pauling and one of his suppliers actually sold over 100 grams of heroin, and that their agreement contemplated sales of over 100 grams of heroin. But let's say that we accept your assessment of the July 3 phone call. You still need to prove that Lowe, right, conspired with Pauling to distribute 14 grams. I notice that you spend quite a lot of time looking, disputing this court's, the district court's reading of Pinckney, but didn't cite any cases supporting your argument that Lowe's involvement can be inferred because he is a reliable supporter. Do you have any legal support for that proposition? I do, Your Honor. So first I would point to this court's opinions in Thompson, which is 633, Federal Appendix 534, Cirillo, which is 468F2nd1233, and United States v. Sealed Vehicle No. 1, which is 440, Federal Appendix 22. Those are cases that first all stand for the proposition that you don't need proof of specific transactions in order to attribute future weight to a drug conspiracy. But how is this, I mean, I'm not, I'm sure. Can I ask a question first? Are those cited in your brief? Your Honor. You don't have a table of authorities in your brief, so it's difficult to know whether what you're citing to us now is in the brief. The Thompson case is cited in our brief. The other two are not. Sealed Vehicle No. 1 is cited in our, is in the appendix. It's cited in our opposition before the district court. Your Honor, there was a reasonable inference available to the jury that Lowe was the supplier of the 14 grams from the prior sale. And the district court completely overlooked that evidence. The wiretap showed the close working relationship between Pauling and Lowe. Pauling knew the details of Lowe's operations. He had visited his stash house. He had seen the stash. He had worked with one of Lowe's other workers, an individual referred to as Playboy. They had mixed heroin together that was captured over the wire on numerous occasions and had plans to continue to do it. What is the direct or circumstantial evidence supporting the theory that Lowe supplied the drugs for the particular transaction? So on the two other occasions when that particular customer named Steve placed orders with Pauling, Lowe was the supplier. Lowe was the supplier for all of the orders that came over the wire that had those large quantities, anywhere from 14 to 30 grams. And this particular customer consistently ordered around 14 or 15 grams. And the nature of their operation showed that they had a preexisting relationship on the first wire call where Pauling is speaking with Lowe about sourcing a 30-gram sale. They had already known each other. He knew where the stash house was. He knew who the people were who worked for Lowe. He owed him money. So there was already this preexisting relationship. So based on that evidence and the fact that then in subsequent sales for similar amounts from the same customer, Lowe was the supplier, the jury could reasonably infer that Lowe was the supplier for that 14-gram sale. In the one transaction, Pauling had reached out to Conrad, the other guy, first. I mean, when is it speculation and when is it a reasonable inference? I mean, to conclude that Lowe provided, assuming there was that prior 14-gram transaction, it's because he did other ones? He must have done this one? Is that the reasoning? No, it's not, Your Honor. So first of all, with respect to Conrad, there's no evidence in the record that Conrad could ever successfully supply Pauling. Even though Pauling reached out to him, Conrad was a middleman who tried to then source the drugs from somebody else and was never able to. And there's evidence in the record of his apologies to Pauling because he wasn't able to come through. Whereas Lowe was somebody who continuously successfully supplied Pauling for similar orders from the same exact customer. So that is a reasonable inference. But could a jury find beyond a reasonable doubt that it was Lowe because there was no evidence that Conrad had actually succeeded? They could, Your Honor, based on, again, based on the nature of the relationship and everything that the jury heard about how much Lowe supplied Pauling during the portion of the conspiracy after that call. But even, again, putting aside that 14-gram sale, all of the evidence that we've just been discussing would all support the inference that the conspiracy existed beyond the 89 grams. On the conspiracy, the alternative theory, there's certainly lots of evidence of interactions between Lowe and Pauling. They mixed drugs together. They discussed pricing. Pauling says, I'll help you get rid of that stuff. There are references to a nice amount. Are there any references to quantities? Is there any evidence from which one can infer quantity? For example, mixing. I mean, do you mix if it's only one gram or do you mix if you usually it's ten grams? Is there any evidence in the record along those lines that would help us conclude that a jury could have found another 11 grams from this other activity? There is, Your Honor. So there is an instance in which Pauling mixed 10 grams that he received from Lowe into 30 grams. That was one of the sort of transactions that was the basis for getting up to the 89 grams. There is, again, the fact that the pattern of conduct between Pauling and Lowe were weights from anywhere from 14 grams all the way up to 30 grams. That's the type of transactions they dealt in. There is the call that — Were there any smaller transactions? Not with respect — Between Lowe. No, not with respect to Lowe. The orders that were placed where there's calls to Lowe, placing orders, were 14 grams, 15 grams, and 30 grams. There's — and then there's the call that Your Honor referenced, which is the one where two days before Pauling is arrested, they have a call in which they talk about the fact that they just mixed another batch of heroin together. Lowe references the fact that there's a nice amount left. Pauling tells him that he's going to work with him to sell it. That's not the only instance of them talking about the fact that Pauling has customers — What's a nice amount? Is there anything in the record that will help us determine what that is? I think based on their course of conduct and the fact that the amounts that they've been selling together start at 14 grams and go all the way up to 30 grams, they're not dealing in small one or two-gram transactions. Is there a case like this where a jury can determine that a nice amount means 11 grams? Well, Your Honor, I would again point to the cases where you don't need a specific transaction in order to get over the threshold. For example, in the sealed vehicle case, there were only 40 grams in the transaction, and it was reasonably foreseeable to the defendant that the conspiracy involved 100 grams or more. I would also point to some of the cases cited by the district court, though I think they support the government's argument. For example, Navarette-Aguilar, which is an out-of-circuit case. There, the relationship could not have been seen to extend beyond the actual transactions because the court said it was a temporary and unstable relationship, and the defendant had sort of substituted in for his friend, who was the real dealer in the transaction. But that's not the case here. Lowe and Pauling had a long-term, and they planned to continue their close working relationship. Is there any evidence showing who purchased the 30 grams of heroin that Pauling cut on June 27, 2016? No, there is not. He makes a number of sales after that. So if there's no evidence of Pauling selling those drugs, why should the jury infer that he needed Lowe or Conrad or anyone else to supply the drugs for the prior transaction that was referenced in the July 3 phone call? Isn't it possible that he was about to fill that order with the drugs that he cut just a few days before? It's possible if you were to infer that the purchase happened between those two time periods. But again, all of that evidence, and I see my time is up, if I can answer your first question. Please. All of that evidence still goes to the alternative basis that the additional 11 grams a rational jury and this jury could reasonably conclude was proven by the fact that they specifically contemplated working together with a batch of heroin and based on their course of conduct. And their plans to continue going that were interrupted by the arrest, that it could have gone from the 89 grams of which there's no dispute to the 100 grams. Is there any evidence as to who the supplier was for the one gram, the quality of which was criticized by the buyer? No. There's no evidence as to who the supplier was for that transaction. Thank you. Thank you. We'll have one minute in rebuttal. Mr. Lee. Good morning. May it please the Court. Yan Chun Lee, Federal Defender, Sir John Pauling. The government, there's an evidentiary leap that the government's got to take between the proof of trial to the 100 gram threshold. And that leap is speculation, not based on evidence. I'll start with the Court's principal concern about this idea that this, what we think is a mythical 14 gram last time transaction. Our view is that the evidence just does not support the existence of such a transaction. But even if it existed, there really is no evidence at all as to the supplier of that deal. Let's back up a little bit about Lowe. Lowe does not show up, even in the government's investigation, until the fourth month. So the government has been investigating Mr. Pauling since February. And the wiretap goes up at the end of May. Pauling does not show up, I'm sorry, Mr. Lowe does not even show up as a supplier until the end of June, until about June 26th. So there had been a number of sales. All the sales to the UC, for instance. The three sales to the UC, the sale to the woman in February about 14 grams, so totaling at least 41 grams. And then at least six transactions, six sales by Mr. Pauling after the tap went up. The record indicate that the suppliers for those earlier sales was someone other than Lowe, or is it just unclear? There's no evidence about it, there's simply no evidence at all. It could have been Lowe. It could have been Lowe, it could have been Conrad, it could have been someone else. But we do know that there were a number of, I think at least six transactions that were caught on the wiretap, in which Mr. Pauling filled the customer's order after the tap went up, but before Lowe even shows up. And again, I would also emphasize that when this customer, this flow, showed up in June 26 and wanted a relatively substantial quantity, which turned out to be, I think, not Lowe. And so I think that this demonstrates that. On the alternative theory that there's a conspiracy, there certainly is evidence that Pauling and Lowe had many conversations, did things together. They mixed drugs together. Pauling went to the stash house. Pauling dealt with Playboy. And Pauling says several times, I'll help you, I'll help you. Why, given the pattern, including the 30-gram sales, et cetera, why wouldn't it be a reasonable inference for the jury to conclude that all of that activity must have generated at least 11 grams? Well, Your Honor, the closeness, so yes, we don't dispute that there was a conspiracy to distribute between Pauling and Lowe. And so, you know, we argued to the jury at trial that this was merely a… Why isn't it reasonable for the jury to find that given all of that activity, nice amount, the number of times they've had these contacts, there must have been at least 11 grams? Well, Your Honor, you know, a gap is a gap in the evidence, even if it's not a canyon, okay? And, you know, we're talking here about a proof beyond a reasonable doubt, right? This is a criminal conviction for an enhanced offense carrying enhanced penalties in the society's condemnation. And it's just not enough to say that, you know, in common parlance, or if we're in the hallway, we could say that, you know, it's probably true. Maybe it's even likely true. But this is a proof beyond reason. They mixed an amount together. I mean, common sense tells me you don't mix one gram? I don't know. That could be wrong. I mean, could a jury conclude that if they're going to mix something, it's got to be something worthwhile? So the mixture, the discussion, and the mixture is linked with this nice amount idea. I think that it comes up in the context of this last sale to Steve in which the two of them, so Pauling and Lowe, mixed some quantity. There was originally 11 that they mixed to be 15. So they took 11 and sort of diluted it by adding these mixing agents to get up to 15 and sold 15 to Steve. And then the nice amount comment was that, oh, we had a nice amount left from that. Again, is that 11 grams or is that only 3 grams, 4 grams, 5 grams? There's not evidence to support that. And in terms of mixing, you know, drug dealers mix drugs to just the purpose of mixing is to enhance the quantity. And so, you know, as a drug dealer, you would like to enhance the quantity, whether it's 1 gram or 10 grams. And there's certainly plenty of that. There's nothing in the record on this. There's simply nothing in the record on this. What's your best analogous case? Our best analogous case, depending on which argument the government uses. So the government offers three theories to bridge this evidentiary gap. In terms of the argument based on specific transactions, we think that Pinckney is the best case, that there's simply no evidence that it's Lowe rather than another supplier. Regarding the government's argument that because they had this close relationship, that that means that Pauling must have, you know, we just have to assume that Pauling must have somehow became a member of that large organization. The best case is this Court's decision in Thompson, which the two of you were on that panel as well, that the mere fact that the defendant . . . It's true, Your Honor. Here it's from 89 to 100. It's less of a . . . It's true, Your Honor. But it's also, it was 2.5 sold by the defendant. But the larger organization had distributed at least 40. And the relationship was also much, much closer. I mean that, the larger organization paid the defendant bail, gave him drugs on credit, gave him a gun, gave him a car. So the relationship was much, much closer. But this Court still said, just because you're closely related to a large-scale distributor doesn't mean that you've joined that organization. And then finally, in terms of this Court, the third argument, which is, I think it's, you could split it out, that the government is also arguing that we can reach, we can bridge this, you know, this evidentiary gap by looking to these, sort of this chatter about these unconsummated but sort of contemplated transactions about the guy from Queens and a nice amount and stuff like that. You know, we have, there's, this Court, there are plenty of cases on that. I would say Shanubi that this Court has long required, even in the context of the guidelines. This Court has been very vigilant about making sure that there's specific evidence of drug quantity before attributing it to a defendant. And I would also like to add that, you know, this is not simply, again, it's not simply an issue about proof beyond a reasonable doubt. It's not simply an issue about sort of this Court's vigilance in drug quantity findings, which has been longstanding. But it's also, you know, this Court should be wary, should be, should look very hard at the government's effort to try to reach the enhanced penalty threshold based on an aggregation of small transactions. Now, you know, the government concedes that if this, if these were simply substantive distribution charges, as opposed to a conspiracy charge, right, you can't aggregate small sales to reach the enhanced threshold. Now, I understand the conspiratorial, there's an exception because it's conspiracy here. And this sort of conspiratorial liability is sort of an end run around this idea that you can't stack the individual small quantities to reach enhanced threshold. Because Congress intended those enhanced penalties for major traffickers and kingpins. So, again, we're not saying that you can't do that for a conspiracy case. You can. But still, Congress's intent in a conspiracy case is for people who are agreeing to distribute large quantities. Not people like Mr. Pauling, who sort of gets that threshold only because of, he doesn't get to that threshold, but if he does, it's only because of these small quantities. May I ask you about rule, I'd like to ask you about Rule 33? Yes, Your Honor. In the district court's discussion of Rule 33, it found that the government's charts regarding the drug quantity attributable to the Pauling low conspiracy was misleading because the charts omitted Steve's June 29th order for a gram of heroin. But if that transaction wasn't linked to low, why should the government have included it in that particular chart? Your Honor, so the chart's misleading in, I think, two different ways. But if I, even before getting to that, that transaction should have been included in the other chart, right? So there's chart one, which just is about the Pauling low conspiracy that they purportedly get to 103. But there's a chart two that includes all of the, purportedly, that looks like includes all of the transactions, including even minuscule amounts of several one-gram transactions. But, again, the June 29th transaction is missing. And the government still has never explained why it's not in either chart. So let's, so going back to the question, why is it, why is it misleading? It's misleading because if, in two different ways, you can look at it two different ways. If, that chart is supposed to list all of the transactions between Pauling and low. It says, you know, that there's one line that says, you know, the July 3rd, it says last time, same thing as last time, and they double it to 28. Well, if it is listed, if it is purportedly listing all of the transactions, it should have, there should have been another line for that last time transaction to be, to be an accurate chart. But because that last time transaction is never listed in there, everybody missed. The record isn't clear that that was low, the one-gram transaction. Well, but it's the only last time transaction, Your Honor. And, you know, this, this really is an instance in which, it's not always the case, but this is an instance in which the absence of evidence of a prior 14-gram transaction is really proof of absence. I mean, there's, you know, all of the transactions between Mr. Pauling and Steve before and after the July 3rd transaction are captured fully on the wiretap. And this idea that there's this missing transaction that's somehow completely underground is pure speculation, that they somehow met in person or used another phone, there's simply no basis to say that. It's unreasonable to infer that there was another transaction. Thank you. Was Steve the buyer for the one, Steve the one who complained about the quality of the one-gram? Yes, Your Honor. So leaving out that one-gram means that you, that there was no argument that when Steve said, give me the same thing as last time, he was referring to the one-gram. But why would he be referring to the one-gram if he was unhappy with the quality? Well, he could have been referring not to, he didn't want that specific type of heroin, but he still wanted heroin instead of cocaine. I think that's what we would say is that that's what that statement is about. Well, but the one-gram wasn't cocaine. Yes, no, I understand, Your Honor. He just, but, you know, all of, even the UC testified to this is that, you know, Mr. Pauling's heroin, even though it was all heroin, varied in quality because he gets it from a bunch of different people. So sometimes it's good, sometimes it's not. And so the same thing as last time I would say is he wants heroin instead of cocaine, but not necessarily that particular brand or type. Thank you, Your Honor. Just a few very brief points. Picking up on the last question, there is no evidence in the record that he was selling Steve anything other than heroin, and the 1G call doesn't undermine the same thing as last time because the context of that call, when he says, how much do you want, same thing as last time, Pauling says, I don't remember what that is. He says 14, which is the reference to 14 grams. There's only one meaning for that call. Did the government have evidence as to coded language that was used in, that's traditionally used in drug transaction calls? We actually had specific evidence of the code used here because what Steve says in that call is he says same thing as last time, and then Pauling says how much, and he says 14th floor, and then the very next call is from Pauling to his supplier saying he has somebody who wants 14 grams. So it's very clear from the evidence here. The other thing is that there actually is evidence that Pauling was using another phone. Government Exhibit 717 at A78, he references the fact that he has another phone that was off, and then, I see my time is up. No, finish your thought. The thought I was going to make was with respect to the Thompson case, the nature of the relationship in that case wasn't actually about the drug dealing. They gave him a gun, they gave him a car, they paid for bail. Here, all of the evidence about the relationship between Pauling and Lowe is specific to their drug relationship, and in the Thompson case, the issue is whether to hold the defendant accountable for what other members of the organization were doing. That's not what's happening here. The government's argument is that Pauling is responsible for what he and Lowe were doing, which, as all the evidence suggests, exceeded the 89 grams beyond the 100 gram threshold. Thank you. Thank you. Thank you both for your arguments. The court will reserve decision.